1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. SACR 19-00047-JLS |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART DEFENDANT'S MOTION TO COMPEL EXPERT DISCOVERY (DOC. 276)** |
| STEPHEN BEAL, | |
| Defendant. | |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This matter is before the Court on Defendant's Motion to Compel Discovery Related to Expert Witness Testimony.  (Doc. 276.)  The matter is fully briefed, *see* Docs. 314, 333 (Opp., Reply, respectively), and the Court heard argument on January 14, 2022.  As set forth herein, the Court grants in part Defendant's Motion to Compel.  To the extent not expressly granted herein, the Motion is denied.

## I.      LEGAL STANDARDS

### A.      Federal Rule of Criminal Procedure 16(a)(1)(E)

Upon the request of a defendant, Rule 16(a)(1)(E) requires the Government to produce certain materials within its "possession, custody, or control."  Specifically, the Government must permit inspection of items that are "material to preparing the defense," items that it "intends to use . . . in its case-in-chief," and items that were "obtained from or [that] belong[] to the defendant."  Fed. R. Crim. P. 16(a)(1)(E)(i)-(iii).

This requires a defendant to "make a prima facie showing of materiality." *United States v. Lucas*, 841 F.3d 796, 804 (9th Cir. 2016) (internal quotation marks omitted).  This standard is described as a "low threshold" that "is satisfied if the information requested would have 'helped' [the defendant] prepare a defense." *Id.*  In making a showing of materiality, "[n]either a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the [G]overnment is in possession of information helpful to the defense." *Id.* (internal quotation marks omitted).

### B.      Federal Rule of Criminal Procedure 16(a)(1)(F)

A specific subsection of Rule 16 imposes upon the Government a duty to produce "results or reports . . . of any scientific test or experiment" if "the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(F).

### C.      Expert Disclosures by the Government

Federal Rule of Criminal Procedure 16(a)(1)(G) sets forth the Government's pretrial expert disclosure obligation. In relevant part, it provides:

**(G) Expert Witnesses.** At the defendant's request, the government

must give to the defendant a written summary of any testimony that the

government intends to use under Rules 702, 703, or 705 of the Federal Rules

of Evidence during its case-in-chief at trial. . . . The summary provided under

this subparagraph must describe the witness's opinions, the bases and reasons

for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).  A district court may order expert disclosures from the government that are "complete, comprehensive, accurate, and tailored to the issues on which the expert is expected to testify," and can also exercise its discretion to direct the government to "identify the documents or information that the expert reviewed in preparing his or her report . . . ." *United States v. W.R. Grace*, 526 F.3d 499, 503, 516 (9th Cir. 2008) (en banc) (quotation marks omitted).

The relevant portion of Rule 16(a)(1)(G) was added in 1993 as subdivision (a)(1)(E). *See* Fed. R. Crim. P. 16 advisory committee's note to 1993 Amendment. Its purpose was to require additional disclosure in order to "minimize surprise . . . , reduce the need for continuances, and to provide [the defendant] with a fair opportunity [to] cross-examin[e] the expert." *Id.*

### D.    *Brady* Materials

*Brady* and its progeny require the Government to produce to a defendant any materials that are "favorable to an accused . . . where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This includes impeachment evidence and exculpatory evidence.  *Strickler v. Greene*, 527 U.S. 263, 280 (1999).  Judged from an appellate perspective, "[s]uch evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted).

In a discovery context, however, the Ninth Circuit has observed that prosecutors must err on the side of disclosure:

[T]he 'materiality' standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials. . . . [J]ust because a prosecutor's failure to disclose evidence does not violate a defendant's due process rights does not mean that the failure to disclose is proper. . . . [T]he absence of prejudice to the defendant does not condone the prosecutor's suppression of exculpatory evidence [ex ante]. . . . [Rather,] the proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses. . . . [I]f doubt exists, it should be resolved in favor of the defendant and full disclosure made. . . . [T]he government [should therefore] disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case, even if the evidence is not admissible, so long as it is reasonably likely to lead to admissible evidence.

*United States v. Price*, 566 F.3d 900, 913 n.14 (9th Cir. 2009) (alterations in the original; internal quotation marks omitted).  Because "[i]nformation that is not exculpatory or impeaching may still be relevant to developing a possible defense," the production required under Rule 16 is "broader than *Brady*." *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013).

### E.   Impeachment Materials—*Giglio* and *Henthorn* Materials

*Giglio* materials relate to impeachment of witnesses who testify at trial.  *See Giglio v. United States*, 405 U.S. 150 (1972).  Generally, these materials are subject to disclosure by the prosecutor only after the witness testifies.  *United States v. Rinn*, 586 F.2d 113, 119 (9th Cir. 1978); *United States v. Feathers*, No. 14-CR-00531-LHK, 2016 WL 7337518, at *12 (N.D. Cal. Dec. 19, 2016).

*Henthorn* materials are similar to *Giglio* materials, consisting of any information in the personnel files of testifying federal law enforcement officers  that could be impeachment evidence.  *See United States v. Henthorn*, 931 F.2d 29, 30-31 (9th Cir. 1991).

1 | Since *Henthorn* impeachment materials are similar to *Giglio* materials; the timing of their

2 | disclosure is the same.

3 |     **F.**    **Jencks Act Materials**

4 |     Jencks Act materials are defined by statute.  The Jencks Act provides, in relevant

5 | part:

6 |     **(b)** After a witness called by the United States has testified on direct

7 |     examination, the court shall, on motion of the defendant, order the United

8 |     States to produce any statement (as hereinafter defined) of the witness in the

9 |     possession of the United States which relates to the subject matter as to which

10 |     the witness has testified.  If the entire contents of any such statement relate to

11 |     the subject matter of the testimony of the witness, the court shall order it to be

12 |     delivered directly to the defendant for his examination and use.

13 | 18 U.S.C. § 3500(b).  By statute, Jencks Act materials generally need not be produced by

14 | the Government until after a witness testifies.  *See* 18 U.S.C. § 3500(a).

15 | **II.**    **STATUS OF EXPERT DISCOVERY AND DISCLOSURES**

16 |     A review of the current status of expert discovery and disclosures is helpful.  The

17 | Government represents that it has produced the curricula vitae and reports of all its experts.

18 | Additionally, the Government represents that it has produced "the entire case files of the

19 | experts, [including] laboratory and law enforcement reports, examiner notes, raw files,

20 | photographs, quality assurance manuals, standard operating procedures, communication

21 | logs, and all other work product pertaining to the noticed expert opinions."  (Opp. at 2.)

22 |     The Government also represents that its *Brady* obligations have been satisfied.

23 | Moreover, the Government represents the FBI Chief Division counsel reviewed the

24 | personnel files of the disclosed experts for impeachment evidence, that is, for any *Henthorn*

25 | and *Giglio* materials—anything implicating the experts' "misconduct, untruthfulness, bias

26 | or substantive violations of failing to follow mandatory protocols with regard to forensic

27 | analysis of evidence."  (Opp. at 2.)  No responsive documents were found.  (*Id.*)  The

28 |

1   Government represents it is currently reviewing additional emails that may be subject to

2   disclosure as Jencks Act material.

3        On December 23, 2021, the Court issued its Order Granting in Part Motion to

4   Exclude Expert Discovery.  (Doc. 325.)  Therein, the Court ordered additional disclosures:

5        As to all experts, to the extent the expert will testify that he or she relied

6   on materials not discussed in his or her reports (such as technical or scholarly

7   articles or scientific experiments) to reach a conclusion or form an opinion, the

8   Government must disclose such reliance as "the bases or reasons for" the

9   expert's opinion.

10        As to both Morefield and Parrot, the Government shall disclose which

11   specific combinations of chemicals, other than the three combinations

12   identified, could be used to make an IED.

13        As to Morefield, the Government shall disclose which specific items,

14   other than those already identified, could be used to make an IED.

15        The Government shall further disclose which specific items or types of

16   items were not tested, the reason why those items or types of items were not

17   tested and, if the reason is that the expert believed that the chance of finding

18   helpful evidence was low, why he believed so.

19        As to Garfinkle, the Government shall disclose which specific items

20   collected were deemed unsuitable for DNA testing and, as to each item or type

21   of item, why they were deemed unsuitable.

22        As to Carpenter, the Government shall disclose which specific items

23   collected were not suitable for fingerprint testing, and why, as to each such

24   item or type of items.

25   Order at 17-18.

26        Under these legal standards, and against this background, the Court considers the

27   present Motion.  In doing so, the Court notes that as to production of documents, Defendant

28   does not specify whether the production he seeks is pursuant to Rule 16(a)(1)(E) or (F).

The latter is more limited in the scope of documents it covers, and its requirements appear to have been met by the Government's productions of the reports and case files. Subsection (a)(1)(E) covers a broader scope of documents.  Both subsections require a showing of materiality, and the lack of specificity between the two does not affect the Court's ruling.

**III.   MOTION TO COMPEL DISCOVERY**

Defendant moves to compel discovery in five categories, one with multiple sub-categories:

(1) The proficiency and competency tests and files of each noticed government expert;

(2) The specific studies and articles relied upon by the examiners in formulating their opinions, including:

(a) Standards, studies, journal articles and texts relied on by the government's noticed experts in rendering opinions, including without limitation all discrimination studies on electrical wires, 9V batteries, and the identification of certain chemicals;

(b) Studies and articles on which expert is relying to formulate the opinion that fuel cannot be identified because it is consumed;

(c) Any documents or materials providing the basis for the opinion that wires in this case are unusual outside the explosives and pyrotechnics world;

(d) Documents or materials relating to why certain trace evidence was tested and other trace evidence was not tested;

(e) All studies relied on in forming the opinion that an explosion can cause changes in the overall specifications of copper wire; and

(f) Documents or materials providing the basis of the opinions about the skills needed to build an IED.

(3) All logs of unexpected results and corrective-action logs for all techniques and methods used by the government experts in this case;

(4) Audit reports for all sections of the FBI labs relevant to the government's noticed experts and their opinions; and

(5) Documents or materials pertaining to why certain items were tested and other evidence was not tested.

(Mot. at 14.)  The Court discusses each.

**(1) The proficiency and competency tests and files of each noticed government expert**

The FBI examiners disclosed as experts in this case are given periodic proficiency tests.  (*See* Doc. 314 at 23-26, Ruth Decl. ¶¶ 3-5.)  According to the declaration of Robin Ruth, Unit Chief, Forensic Analysis Support United, FBI Forensic Laboratory, all the FBI experts disclosed by the Government in this case passed their proficiency tests in the prior two years, and the Government represents any failed tests would have resulted in documentation in the expert's personnel file and would have been produced as part of the *Henthorn* review and production.  (Opp. at 5-6; Ruth Decl. ¶¶ 3-5.)  Examiners are not given grades; the tests are evaluated as "satisfactory or unsatisfactory."  (Ruth Decl. ¶ 5.)

Defendant seeks production of the tests themselves, as well as any file that shows the method in which the tests were given, including whether the tests were given under "test-blind" conditions, that is, where the examiner is unaware that he or she is being tested. (*See* Mot. at 8-9.)  Essentially, the defense seeks material that will enable it to "look behind" the proficiency test, to ascertain whether a satisfactory performance on the test is a sufficient indication of the examiner's overall reliability; that is, Defendant seeks to "test" the test itself.  (*See id.* at 9.)  The defense would also like to review the proficiency tests "to assess whether the proficiency tests were representative of the work in this case."  (*Id.*)

This is also in the nature of an insufficient "general description of [why] the information sought" is material rather than a presentation of "facts which would tend to show" that information is "helpful to the defense."  *Lucas*, 841 F.3d at 804 (internal quotation marks omitted).

1    Therefore, this request is denied.  Moreover, the results of the proficiency tests have

2    been sufficiently disclosed as set forth in the Ruth Declaration.  And because the

3    examiner's personnel files have been examined for *Giglio* and *Henthorn* materials, those

4    files need not be produced.

5    **(2) The specific studies and articles relied upon by the examiners in formulating**

6    **their opinions**

7    The Court's December 23, 2021 Order addressed this issue.  The bases of and/or the

8    reasoning underlying any expert opinion or conclusion must be disclosed.  As noted

9    therein, to the extent ***any*** Government expert will testify in its case-in-chief[1] that his or her

10   opinion or conclusion is based on any "standards, studies, journal articles, [or] texts,"[2]

11   those must be disclosed as part of the Rule 16(a)(1)(G) disclosure.  (Mot. at 9-10.)

12   Conversely, to the extent that such materials are mere background that are not

13   specifically referenced, or that they form part of the wealth of knowledge possessed by any

14   FBI examiner (or, more generally, by any witness likely to qualify as an expert under

15   Federal Rule of Evidence 702), those materials need not be disclosed or produced.

16   As for the other materials related to the bases of the experts' opinions and

17   conclusions, the Government represents that it has already produced "the entire case files of

18   the experts, [including] laboratory and law enforcement reports, examiner notes, raw files,

19   photographs, quality assurance manuals, standard operating procedures, communication

20   logs, and all other work product pertaining to the noticed expert opinions."  (Opp. at 2.)

---

[1] The Court's December 23, 2021 Order did not specifically limit its requirement to the Government's case-in-chief, but such limitation was intended.  Therefore, generally, the Government's representation that it does not intend to elicit such testimony in its case-in-chief fulfills this requirement.  (*See* Opp. at 8.)

[2] The Court's December 23, 2021 Order described these as "technical or scholarly articles," but in using this language, the Court did not mean anything different than Defendant's description of "standards, studies, journal articles, or texts," which appear to the Court to refer to the same type of technical, scholarly, or scientific materials.

1   Except as ordered in the December 23, 2021 Order (as clarified herein), Defendant's

2   request is denied.[3]

3   **(3) All logs of unexpected results and corrective-action logs for all techniques**

4   **and methods used by the government experts in this case**

5   The Government represents that by producing the examiners' entire case files, it has

6   produced any materials related to unexpected results and errors in this case.  (*See* Opp. at

7   14 ("The government has disclosed the entire case files relating to the examinations in

8   defendant's case which would have included unexpected results and errors committed by

9   the examiners in evaluating the evidence in defendant's case.").)

10   Unit Chief Ruth explains the significance of corrective-action logs:

11   Corrective Action Requests ("CARs") are a tool used in the continual

12   improvement of laboratory processes and address detected nonconformities,

13   and through addressing the root cause(s) of the nonconformities, prevent the

14   recurrence thereof. Some examples of CARs involve the following: an

15   examiner erasing a mistake in case notes instead of crossing through the error,

16   placing evidence on an improper shelf in an evidence storage room, not

17   notifying the proper technical leader within the Laboratory when a qualifying

18   issue arises, and disclosing accurate testing results when not formally

19   authorized to do so.

20   (Ruth Decl. ¶ 6.)  Significantly, CARs contain no identifying information of any examiner.

21   (*Id.*)

22   Here, the Government represents that it has provided (or will provide) unexpected-

23   results logs and corrective-action logs for any examination in this case, or where materials

24   related to any corrective actions are subject to production under *Brady*, *Giglio*, and/or

25   *Henthorn*.  Like additional discovery of materials related to the proficiency tests, additional

26

27

28   [3] The Court will further address one area of anticipated testimony, related to Morefield's anticipated testimony that certain wires are used only in pyrotechnics, in connection with Defendant's *Daubert* motion.  (*See* Dec. 23, 2021 Order at 8; Doc. 349, Def. *Daubert* Mot. at 33-34.)

10

1   materials related to unexpected-results logs and corrective-action logs seek to look behind

2   the processes that are themselves designed to help ensure accuracy of testing results.  Such

3   discovery is too far afield to be discoverable.  Defendant here can articulate the reasons he

4   seeks the materials, but he does not "present facts which would tend to show" that such

5   information would be helpful to the defense.  *Lucas*, 841 F.3d at 804 (internal quotation

6   marks omitted).  If there has been error specific to Defendant's case, that fact is material,

7   but it has been produced.  On the other hand, if there has been no error specific to

8   Defendant's case, then there is nothing material to produce.  The specifics of what errors

9   have occurred in other cases is not material.

10          Therefore, the Court denies this request.

11          **(4) Audit reports for all sections of the FBI labs relevant to the government's**

12              **noticed experts and their opinions**

13          Defendants requested audit reports related to audits of the FBI laboratory.  (Mot. at

14   6.)  The Government has offered to produce the FBI laboratory accreditation certificate.

15   (*Id.*)  Unit Chief Ruth explains that there are internal audit files and external audit files

16   (from an international accrediting organization audit), in the range of thousands of pages,

17   with the exact volume of pages depending on the date range specified.  (Ruth Decl. ¶ 9.)

18   The accrediting organization provides a report of unspecified length, but it does not

19   reference specific cases.  (*Id.*)  If any negative information regarding a case is detected by

20   an internal or external audit, that fact would be noted in the case files, which have already

21   been produced by the Government.  (*Id.*)  Like the materials in the two previous

22   subsections, Defendant has not made a prima facie showing of materiality as to the audit

23   reports.

24          Upon consideration, however, the Court precludes the Government from offering

25   evidence of the accreditation of the FBI laboratory, unless and until Defendant offers

26   evidence that suggests the lab lacks an appropriate accreditation or generally lacks quality

27   control.

28

1    **(5) Documents or materials pertaining to why certain items were tested and**
2    **other evidence was not tested**

3        Defendant seeks "communications between and about the FBI examiners and
4    examinations," and although the Government objects to the request as framed, it has agreed
5    to review certain specified emails.  (*See* Mot. at 12 & Ex. 6.)  According to the defense, the
6    communications it seeks may be relevant to establishing confirmation bias and/or
7    contextual bias with respect to the decisions to test certain evidence and to not test certain
8    other evidence.  (*Id.* at 12 & n.3.)  "Confirmation bias," according to the defense, occurs
9    when "examiners interpret information, or look for new evidence, in a way that conforms to
10   their pre-existing beliefs or assumptions."  (*Id.* at 12 n.3 (internal quotation marks
11   omitted).)  Contextual bias occurs when examiners are "influenced by irrelevant
12   background information."  (*Id.* (quotation marks omitted).)  The Court agrees that
13   Defendant has met the materiality standard on the narrow issue of confirmation bias and
14   contextual bias in the selection of and exclusion of evidence for testing.

15       In its December 23, 2021, Order, the Court ordered certain disclosures regarding
16   what evidence was not tested, and why.[4]  (Order at 17-18.)  The Court now orders a similar
17   production of any written communications to, from, between, or among the FBI examiners
18   noticed as experts in this case that fall into the categories 2(b)-(h) set forth in Defendant's
19   October 29, 2021 Letter at page 2.[5]  (*See* Mot. Ex. 4; *cf. id.* Ex. 6 (Government's agreement
20   to produce described email communications in categories 2(b)-(h).)

---

[4] Moreover, to the extent that any expert will testify that the decision not to test was based on any standards, studies, journal articles, or texts, those must also be disclosed as part of the Rule 16(a)(1)(G) disclosure, consistent with the discussion in subsection (2), *supra*.

[5] Specifically, those categories are:
> d. any preliminary determinations or assessments about items of evidence even if those determinations or assessments did not end up in a report; e. any discussions about what types of tests would be conducted; f. any discussions about which items would be examined, and which were not; g. any discussions about which items were selected for testing, and which were not; and h. any analysis or discussion of limitations relating to the examinations and testing conducted.

(Mot. Ex. 4 at 2 (paragraph structure altered).)  At the hearing, the prosecutor represented such materials have been produced.

1

## IV.   CONCLUSION

2     As set forth herein, the Court grants in part Defendant's Motion to Compel.  The

3  Court orders the production of written communications, not limited to emails, described in

4  the previous section.  The remainder of Defendant's Motion is denied.  Production is

5  ordered within ten days of the entry of this Order.  The Court's December 23, 2021 has

6  been clarified as set forth herein, and additional production by the Government may be

7  required, as set forth in sections III(2) and III(5).

8     **IT IS SO ORDERED.**

9     DATED:  January 18, 2022

10

11

12                          **JOSEPHINE L. STATON**
                          _____
13                          HON. JOSEPHINE L. STATON
                          United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28