TRACY L. WILKISON
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
MARK TAKLA (Cal. Bar No. 218111)
ANNAMARTINE SALICK (Cal. Bar No. 309254)
WILSON PARK (Cal. Bar No. 239527)
MARIA JHAI (Cal. Bar No. 283059)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    United States Attorney's Office
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone:  (714) 338-3500
    Facsimile:  (714) 338-3561
    Email:    mark.takla@usdoj.gov
            annamartine.salick2@usdoj.gov
            wilson.park@usdoj.gov
            maria.jhai@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | NO. SA CR 19-047-JLS |
|---|---|
| Plaintiff, | GOVERNMENT'S FILING OF PUBLIC REDACTED VERSION OF THE COURT'S ORDER DENYING MOTIONS TO EXCLUDE EXPERT EVIDENCE (Dkts. 349, 350) AND ORDER VACATING EVIDENTIARY HEARINGS |
| v. | |
| STEPHEN WILLIAM BEAL, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files a public redacted version of the Court's

///

Order Denying Motions to Exclude Expert Evidence (Dkts. 349, 350) and Order Vacating Evidentiary Hearings, which is attached as Exhibit A.

Dated: April 11, 2022            Respectfully submitted,

                                 TRACY L. WILKISON
                                 United States Attorney

                                 CHRISTOPHER D. GRIGG
                                 Assistant United States Attorney
                                 Chief, National Security Division


                                 _____/s/ Mark Takla_____
                                 MARK TAKLA
                                 ANNAMARTINE SALICK
                                 WILSON PARK
                                 MARIA JHAI
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 United States of America

# EXHIBIT A

1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>    v.<br><br>STEPHEN WILLIAM BEAL,<br><br>         Defendant. | Case No. 8:19-CR-00047-JLS<br><br><br>ORDER DENYING MOTIONS TO EXCLUDE EXPERT EVIDENCE (Docs. 349, 350)<br><br>ORDER VACATING EVIDENTIARY HEARINGS |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   Presently before the Court are two motions to exclude expert evidence filed by Defendant.  Specifically, Defendant has filed a Motion to Exclude Testimony of Government's Explosives Experts (Doc. 349) and a Motion to Exclude Testimony of Other Laboratory Experts.  (Doc. 350).  The Government filed a consolidated Opposition (Doc. 421), and Defendant filed a consolidated Reply (Doc. 437).  The Motions were heard on February 25, 2022.

   Defendant's Motions call upon the Court to fulfill its role as the "gatekeeper" of expert evidence by attending to "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  The Court first discusses the relevant legal standards before discussing issues regarding each challenged expert. Defendant also challenges some of the expert opinion evidence under Federal Rule of Evidence 403, arguing it should be excluded based on cumulativeness and on the danger of unfair prejudice.  As they arise, the Rule 403 issues are discussed along with the expert opinions to which they relate.

As set forth herein, the Court DENIES Defendant's Motions.

## I.    LEGAL STANDARDS

### A.    Federal Rule of Evidence 702

Federal Rule of Evidence 702 permits expert testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, to be admissible under Rule 702, opinion testimony must be made by a qualified witness; it must be based on specialized knowledge; the opinion must be helpful to the understanding of other evidence or to the understanding of a fact in issue; the opinion must have a sufficient foundation in fact, that is, it must be "based sufficient facts or data"; and finally, it must be reliable, resting on a foundation of "reliable principles and methods" that have been "reliably applied."

The proponent of the expert carries the burden of proving admissibility.  *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  Expert testimony is admissible if the above requirements are met by a preponderance of the evidence. *Daubert*, 509 U.S. at 593, n.10 (discussing applicability of Federal Rule of Evidence 104(a) to expert testimony and citing *Bourjaily v. United States*, 483 U.S. 171, 175-

176 (1987), for preponderance of evidence standard).  Exclusion of expert testimony is "the exception rather than the rule."  *See* Fed. R. Evid. 702 advisory committee note to 2000 amendment.  Therefore, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

The Rule 702(a) requirement that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue" goes primarily to relevance. *Primiano*, 598 F.3d at 564.  "Reliable expert testimony need only be relevant, and it need not establish every element that the plaintiff must prove, in order to be admissible."  *Primiano*, 598 F.3d at 565.

The Rule 702(b) "facts or data" upon which the expert opinion must be based may come from the expert's personal observation, or the expert may simply be "made aware of" those facts or data.  Fed. R. Evid. 703.  The "facts or data" need not be independently admissible if those facts or data are of the types experts in the field would reasonably rely upon.  *Id.*

Rule 702(c) and (d) reliability indicators are discussed at length in *Daubert*.  As explained by the Ninth Circuit, as to scientific testimony,

> [i]n *Daubert*, the Supreme Court gave a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community.

*Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002).  Despite this specific guidance, the *Daubert* analysis remains a flexible one, even as to scientific expert opinions.  *See Primiano*, 598 F.3d at 564 ("For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as

3

testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one.").

Non-scientific expert testimony is subject to a flexible analysis as well. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In *Kumho Tire*, the Supreme Court extended the *Daubert* standard to apply to non-scientific expert testimony. *See id.* at 147 ("We concede that the Court in Daubert referred only to 'scientific' knowledge."). In doing so, the Supreme Court emphasized the flexibility of the *Daubert* standard: "*Daubert* makes clear that the factors it mentions do not constitute a definitive checklist or test . . . [a]nd *Daubert* adds that the gatekeeping inquiry must be tied to the facts of a particular case." *Id.* at 150 (internal quotation marks omitted). The objective of the Court's gatekeeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. And "a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."

For example, in *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000), the Ninth Circuit *Daubert* factors were inapplicable to a gang expert's testimony because "reliability depend[ed] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.* The *Daubert* factors, with their focus on peer review, publication, and the testability of methodologies, were simply inapplicable in that field of expertise. *Id.* Similarly, in a products liability case, a surgeon's experience with prosthetic elbow replacements rendered him qualified "by knowledge, skill, experience, training, or education" to give an opinion based on the expected minimum lifespan of an implanted prosthetic elbow. *Primiano*, 598 F.3d at 566-67.

Additionally, there may be matters upon which an expert may testify based solely on his or her experience. "A witness can qualify as an expert through practical

4

experience in a particular field, not just through academic training." *Rogers v. Raymark Industries, Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991).  The Committee Notes to Rule 702 state that "[n]othing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.  Indeed, the Committee Notes continue, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.*  Nevertheless, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* In performing its gatekeeping functions, a trial court has "broad latitude" in determining the reliability of expert testimony.  *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020).

### B.    Federal Rule of Evidence 403

Defendant challenges some of the expert opinions under Federal Rule of Evidence 403, which provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403.

Thus, the starting point of the Rule 403 analysis is the probative value of the evidence sought to be excluded.  The mid-point of that analysis is the nature of the balancing test that Rule 403 sets up.  The Rule's balancing test favors admission by requiring that the probative value of the evidence be "substantially outweighed" by the Rule 403 counterbalancing considerations: "unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The final part of the analysis is to apply this test.

In assessing the danger of unfair prejudice under Rule 403, courts are cautioned to pay particularly close attention to otherwise admissible expert evidence due to the potential weight that jurors may place on such evidence. *See Daubert*, 509 U.S. at 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (internal quotation marks omitted); *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").

## II.    MOREFIELD AND FINNERTY'S OPINIONS REGARDING BOMB COMPONENTS

Defendant first challenges opinions related to bomb construction that are expected to be offered by the Government's explosives experts, Eric S. Morefield and Kevin D. Finnerty. (*See* Mot. at 17-34.)

### A.    Experts' Qualifications and Experience

Both experts' curricula vitae ("CVs") are attached to the Defendant's Motion as part of Exhibits 4 and 8. (*See* Doc. 349 at 78-86, Mot. Ex. 4 (Morefield CV); *id.* at 194-204, Mot. Ex. 8 (Finnerty CV).)

#### 1.    Morefield

Morefield holds a master's degree in forensics with a concentration in Arson and Explosives Investigations. He has almost two decades of experience (since June 2003) in law enforcement working with IEDs, working for the FBI most of those years, including almost seven years of forensic examinations as an Explosives and Hazardous Devices Examiner with the FBI Laboratory. As part of his qualifications,

the Government disclosed on October 29, 2021, that Morefield "has examined in various capacities over 100 post-blast improvised explosive devices in training . . . , participated in the building of over 80 improvised explosive devices, and has seen over 200 improvised explosive devices detonate." (Mot. Ex. 4 at 2 (Gov. Oct. 29, 2021 Discl. Ltr.).)  Morefield also conducted a study and wrote a scholarly paper in pursuit of his master's degree on the explosive blast pressure required to break wires, entitled *The Blast Overpressure Required to Break Various Wires in Improvised Explosive Device Fuzing Systems*.  (*See* Doc. 349 at 87-119, Mot. Ex. 4 ("Morefield article") (unpub.).)

### 2.    Finnerty

Finnerty's academic degrees are in unrelated fields, but he has even more IED-related law enforcement experience, with over two decades of experience (since May 1997) in law enforcement working with IEDs, including approximately seventeen years as an Explosives and Hazardous Devices Examiner with the FBI Laboratory.  As part of Finnerty's qualifications, the Government disclosed on October 29, 2021, that he "has examined in various capacities over 100 post-blast improvised explosive devices in training . . . , participated in the building of over 200 improvised explosive devices, and has seen over 400 improvised explosive devices detonate." (Mot. Ex. 4 at 3.)

### B.    Expert Reports

### 1.    Morefield

Morefield's 57-page January 17, 2019 Report is attached as Exhibit 5 to Defendant's Motion.  (Doc. 349 at 120-177 ("Morefield Rpt.").)  Morefield's Report is significant for its discussion of remnants of a 9-volt battery, fragments of wire, and fragments of glass recovered from the blast scene.

Specifically, Morefield's Report first discusses the remains of a 9-volt battery and five of its expected six internal 1.5-volt battery cells.  (Morefield Rpt. at 14-16.)  He opines that a 9-volt battery is sufficient to power an IED initiator.  (*Id.* at 4.)  Two

of the 1.5-volt cells were found "embedded in a plywood sub-floor directly above the seat of the explosion." (*Id.* at 15.)  Such "embedding of low mass items into solid surfaces at a distance is a unique characteristic indicating that the embedded item was in close proximity to an explosive at the time of initiation." (*Id.*)

Morefield next discusses fragments of yellow wires found at the blast scene. (*Id.* at 16-19.)  He notes that one such wire fragment has

> [a] longitudinal ridge or seam [that] runs the length of the wire insulation, with the insulation on one side of the seam blackened and the opposite side of the seam relatively clean in appearance, indicating that the item was originally part of a multi-conductor cord that was likely still connected to a parallel insulated wire at the time of the explosion.

(*Id.* at 17 (referring to Item 189-3).)  Thereafter, Morefield repeatedly refers to wire fragments as having "longitudinal ridge[s] or seam[s]," noting in each instance merely that such condition "indicat[es] that the item was originally part of a multi-conductor cord." (*Id.* at 17-18 (so noting as to wire fragments identified as Item 201-1, 281, 310-1, 313, 326, and 329).)[1]

Finally, Morefield describes a possible confinement chamber based on the evidence recovered. (*See id.* at 14, 19.)  Morefield first relies on chemical analysis of evidence (as reported by FBI chemist Raleigh Parrot) that "revealed the presence of ions which could indicate the use of a chlorate or perchlorate based oxidizer within an explosive composition." (*Id.* at 14.)  From that, he described the following process: "When properly ignited by a suitable source of heat, low explosives are designed to deflagrate and generate gases.  Properly confined in a container, the gasses generate pressure on the container walls and cause an explosion of a container."[2] (*Id.*)

---

[1] Like Morefield, Finnerty's report first explains the significance of his observations of the wire fragment and then later merely indicates that the presence of the "longitudinal ridges or seams" are indicative of a multi-conductor cord. (*See* Doc. 349 at 218-236, Mot. Ex. 11 at 6-7 &10 ("Finnerty Rpt.") (referring to five of the same six items described by Morefield:  items 201-1, 310-1, 313, 326, & 329).)

[2] Morefield also notes that an explosion can result from "self-containment" of low explosives, and that "[h]igh explosives require no confinement to explode." (Morefield at 14.)

Morefield discusses a possible confinement container producing multiple fragments of blue-colored glass upon explosion, including fragments that were surgically removed from the deceased victim by the Orange County Coroner.  (*Id.* at 14, 19.)  He states that "[b]oth primary and secondary fragmentation from an IED explosion are capable of producing minute fragments cable of penetrating cloth and skin." (*Id.* at 19.)  He does not specifically explain the difference between "primary and secondary fragmentation," but it is clear from context that primary fragmentation refers to the glass fragments would have been part of a confinement container, and secondary fragmentation would mean that a glass object in the vicinity of the blast was the source of the fragments.  Specifically, Morefield states that "[i]t is not known . . . if there was an object between the IED and [the victim that was] capable of producing secondary fragmentation."  (*Id.*)

### 2. Finnerty

In addition to reiterating certain key opinions found in the Morefield Report, *supra* note 1, Finnerty's Report also describes in detail his examination of the wire fragments and seized wires.  (Finnerty Rpt. at 5-15.)  Additionally, his chart summarizes his comparisons of the wire fragments with seized wires.  (*Id.* at 16, Fig. 16.)

### C.   Opinions Regarding the Physical Components of the IED

Defendant seeks to exclude the experts' opinions that examination of the remnants of the 9-volt battery, the wire fragments, and the glass fragments reveals that these items were "in close proximity" or were in "intimate contact" with the bomb and, in some instances, were so situated "at the moment of initiation."  (Mot. at 18-19.)  The experts' opinions on this issue tend to establish that these specific items were part of the IED.  Relatedly, Defendant seeks to exclude testimony regarding how "a simple switch" could have initiated the IED when the decedent opened the package in which it was contained.  No such switch was recovered from the scene.

### 1.     The Relevant Analysis is a Flexible One

At the outset, the Court notes that Defendant relies too rigidly on the *Daubert* standard for scientific expert evidence.  (*See* Mot. at 18 (referring to "objective testing, peer review, an error rate, and a standard and general acceptance").)  The argued lack of general acceptance in the scientific community and lack of validation of Morefield's and Finnerty's opinions (Mot. at 17-24) underscore this rigid reliance which, as discussed above, is not supported by *Daubert* itself and which is expressly rejected by *Kuhmo Tire*, both of which apply a flexible analysis.

*Kuhmo Tire* made clear that where expert testimony is based on personal experience, an expert must bring to his or her testimony "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  526 U.S. at 152.  But the Advisory Committee Notes to Rule 702 make clear that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Here, Morefield's and Finnerty's field of expertise is not unlike the surgeon in *Primiano*, where the court recognized "that medicine is scientific, but not entirely a science[, and more like] a learned profession, deeply rooted in a number of sciences." *Primiano*, 598 F.3d at 565 (internal quotation marks omitted).  In *Primiano*, in concluding that the district court abused its discretion in excluding the surgeon's testimony, the Ninth Circuit took particular note of the surgeon's "knowledge and experience."  *Id.* at 567.

Here, the study of explosives and IEDs (in an investigatory setting), although applying scientific principles, is not a strictly scientific endeavor.  For this reason, it calls out for a flexible analysis of the reliability of the expert testimony.  Like the surgeon's "learned profession" discussed by the Ninth Circuit in *Primiano*, forensic investigations of explosives appear to the Court to be a practical discipline that applies scientific knowledge, in this case, both chemistry and physics, along with some engineering concepts.  Like the surgeon in *Primiano*, Morefield and Finnerty may,

based on their decades of experience of examining such evidence, opine about how the evidence collected at the scene of the explosion bear the same characteristics of other items collected after other explosions.

The experts' experience in blowing things up and in carefully examining the rubble left behind after doing so has prepared them to make observations about that rubble that are qualitatively superior—that is, more reliable—than someone without this experience. Simply put, based on their experience, these experts know how to distinguish between items that were part of a bomb and items that were not part of a bomb. They have this know-how in much the same way as did the surgeon in *Primiano*—through years of experience in a highly specialized field.

### 2. Reliability

With this in mind, the Court separately discusses the reliability of the opinions about the glass, wires, and 9-volt battery.

### a. Glass[3]

Defendant argues that there is no standard for determining whether certain glass and plastic fragments have damage consistent with being near explosives at the time of initiation. (Mot. at 19.) It may be true that there is no generally accepted objective standard for drawing this type of conclusion, but under *Kumho Tire*, a generally accepted objective standard is not required. *Kumho Tire*, 526 U.S. at 151-52 (noting that "general acceptance," a *Daubert* factor related to scientific evidence, should be considered only "where [it is a] reasonable measures of the reliability of expert testimony"). Here, to arrive at his conclusion, Morefield examined the relevant

---

[3] Defendant makes a specific argument that Morefield lacks qualifications to opine regarding glass and plastic fragments because such issues fall into a separate scientific discipline, and the FBI has a different section related to minerology for such analysis. (*See* Mot. at 26-27.) The Government responds that the expert evaluation that is needed in this instance is one who can opine regarding the effects of an explosion on plastic and glass. (Opp. at 11-12.) Thus, the Government argues that if the issue were a comparison between two types of glass or plastic, then a mineralogist would be needed; however, here, where an expert is needed to determine whether glass and plastic were in close proximity to an explosive device, the expertise needed is that possessed by an explosives expert. The Court agrees, and concludes that Morefield is qualified to give opinions regarding the glass and plastic fragments recovered from the blast scene.

evidence and, based on his examination (and his experience), as detailed in his Report, arrived at certain conclusions.  Additionally, the Government disclosed the basis for this opinion as the fragmented and melted condition of the glass, along with evidence that fragments were adhered to the deceased victim's sweater and one was embedded in the victim's body.  (*See* Mot. Ex. 4 at 2 (Gov. Oct. 29, 2021 Discl. Ltr.).)  On this record, Morefield's opinions regarding the glass fragments are sufficiently reliable.

### b.    Wires

As to the wires being in close proximity, the experts' opinions also involve careful visual and microscopic examination of objects by eyes trained to make specific observations that would go unnoticed by untrained eyes.  As to all items, but particularly as to the wires, the experts describe the specified items in detail, noting each item's significance, each item's condition, what significance the expert places on each item's condition, and the rationale for assigning that significance.  On such a record, the reliability of the evidence is easily discerned.

Morefield does not merely make a conclusion, he explains why he arrived at a conclusion.  For instance, Morefield describes Item 329 as a piece of drywall with an embedded wire fragment.  (Morefield Rpt. at 18.)  He explains the significance of how the wire fragment was found, that "[t]he embedding of low mass items into solid surfaces at a distance is a unique characteristic indicating that the embedded item was in close proximity to an explosive at the time of initiation."  (*Id.*)  This explanation establishes the reliability of his opinion regarding the wires being in close proximity of the explosion at the point of initiation (and thus, part of the IED's fuzing).

### c.    Battery Cells

As for the battery parts, two of the six 1.5-volt battery cells that comprise the 9-volt battery were found embedded in the sub-floor directly above the seat of the explosion.  (Morefield Rpt. at 15.)  On this point, as he did regarding the wires, Morefield sets forth the opinion that this embedding is characteristic of the "embedded item [having been] in close proximity to an explosive at the time of initiation."  (*Id.*)

And like the wires, this is an area that the expert's opinion is informed by his experience.  Again, it is not that the expert's experience is the sole basis for the opinion, it is his examination of the evidence and his experience of having observed other post-explosion evidence.  This, together with the explanation of why he arrived at his conclusion establishes the reliability of his conclusion.  The Government's disclosure further establishes the reliability of his conclusion, by noting that Morefield may testify that "the battery cells were deformed, twisted, and charred, and the wires were bent at irregular angles, deformed, melted, charred, and had ragged and torn insulation" as characteristic of being in proximity to the explosion.  (*See* Mot. Ex. 4 at 2 (Gov. Oct. 29, 2021 Discl. Ltr.).)

Therefore, as to Morefield's and Finnerty's Reports about the components of the IED in this case, although there are undeniably scientific principles underlying the expert's opinions,[4] in order to reach their conclusions about the evidence in this case, the experts undertook detailed examinations of that evidence, and they relied on similar observations they've made throughout decades of experience to arrive at their conclusions in this case.  Moreover, they explained the reasons for their conclusions and the Government disclosed additional reasons therefor.  Accordingly, the Court rejects Defendant's arguments to exclude this evidence.

### 3. Sufficient Factual Basis

Defendant contends that opinions regarding the glass, wires, battery, and a switch lack a basis in fact and therefore must be excluded.  (*See* Mot. at 27-29.)  The Court disagrees.  As for the glass, wires, and battery parts, parts of these items were found at the blast scene and, after examination, their location and condition provided the factual bases for the experts' opinions.

Relatedly, as to a switch, testimony that no switch was found, but that such an initiator could have been used, and how such a device could have been constructed, is

---

[4] Notably, Defendant does not argue that the experts' opinions lack foundation in the basic building-block scientific concepts in the fields of chemistry and physics.

also admissible. At the outset, although Defendant is correct that no switch was found, it would be more precise to say that no switch was found *intact*. There is a basis in fact for the experts' opinions that the IED had such a switch.

First, as explained by Morefield, such an initiation device is required for the explosion to have occurred. (*See* Morefield at 19 (designating "Switch" as a heading in a listing of components of an explosive device but noting that "[n]o definitive electrical switch components could be identified within the submitted specimens").) Second, a witness testified that the decedent was opening a package when the explosion occurred. These facts led to the disclosed opinion that "[w]hile the exact switch . . . could not be identified, a simple switch could be fashioned using two wires that would cause the IED to explode when the box is opened by an individual." (*See* Mot. Ex. 1 at 3 (Gov. Oct. 1, 2021 Discl. Ltr.).) From this, Morefield is expected to testify that the wire fragments found at the blast scene could be the remnants of the "simple switch" he describes. (*See* Opp. at 15-16; Mot. Ex. 1 at 3 (Gov. Oct. 1, 2021 Discl. Ltr.) (disclosing Morefield's testimony regarding such a switch as including an opinion that "[a]ny wire, including duplex, single core, copper conductor [like the discovered fragments] could be used to fashion the switch with no additional components").)

On this record, this is a sufficient basis in fact for the experts' opinions.

Thus, there is no basis for excluding the Morefield and Finnerty opinions regarding the physical components of the bomb under Rule 702.

## D. Similarity of Wire Fragments to Wires Seized from Defendant's Residence

Defendant challenges both the factual basis of and the reliability of the Morefield's and Finnerty's Reports comparing the wire fragments collected from the scene of the explosion with wires seized from Defendant's residence. He also contends that no expert opinion is necessary because the jury can make their own visual comparisons.

### 1.     The Experts' Comparisons Provide an Adequate Factual Basis

First, Morefield identifies six of the seven wire fragments he identified in his report as having "longitudinal ridge[s] or seam[s]" (i.e., Items 189-3, 201-1, 310-1, 313, 326-1, 329) as being similar to wires found on three other devices seized from Defendant's residence (none of which are IEDs).  (Morefield Rpt. at 55.)  Specifically, these fragments are similar to the "lead wires" in an "electric match" seized from Defendant's residence (Item 357), wires found in "[t]he switch position" of an "electronic assembly" on a "plastic project board" (Item 58), and wires found on "a multi-function homemade rocketry component" (Item 43).  (*Id.* at 42, 44, & 49.)  In noting the similarities, Morefield observed the wires were similar in their "[d]esign [in that] they had Similar Type of Insulation and Conductor."  (*See id.* at 55)  The wire is described as "[y]ellow plastic insulated, parallel multi-conductor 23-25AWG [American Wire Gauge] single strand copper colored conductor."  (*Id.*)

Next, Finnerty notes that, based on his own observations, the six items discussed by Morefield, plus additional items (specifically, Items 189-2, 189-3, 201-1, 310-1, 310-2, 310-3 313, 326, and 329), which were recovered from the blast scene, are all yellow-insulated duplex 23-25 AWG wire with a single strand copper colored conductor that have damage consistent with having been in close proximity to an explosion.  (Finnerty Rpt. at 5-10, 16 (Fig. 16).)  Having these same characteristics (that is, duplex, yellow-insulated wire of 23-25 AWG with a single strand copper colored conductor) are six other wires recovered from Defendant's residence.[5]  (*See id.* at 16 (Fig. 16, identifying Items 499, 500, 501, 503, 514 & 519).)  Two of these wires (Items 500 and 519) are described in the table as additionally having a red stripe on one wire not found on the wire fragments.  (*Id.*)  Photographs and detailed descriptions of these items seized from Defendant's residence appear in the report.  By

---

[5] These six items are in addition to those identified in Morefield's Report, discussed in the preceding paragraph.

way of example,[6] photographs of items 501 and 503 are found on page 13, and they are both described as "electric match[es] with duplex yellow plastic insulated wire with a single-strand copper-colored conductor . . . corresponding to a 24 AWG." (*Id.* at 13.)

These detailed descriptions of their examinations and comparisons establish a sufficient factual basis for the experts' opinions.

### 2. The Comparisons Are a Proper Subject for Expert Testimony

Defendant argues that no expertise is necessary because this is a mere visual comparison that the jury can do. (Mot. at 30.) The Court disagrees. The comparison is between fragments of wire and undamaged wire. To be sure, where the insulation is intact, the jury could no doubt discern the similarity in color—this is evident from the photographs. (*Compare e.g.,* Finnerty Rpt. at 5, Figs. 2-3 *with, e.g., id.* at 13, Figs. 11-12.) But the experts' opinions are helpful on the issue of how the longitudinal ridges or seams are indicative of a duplex wire (and therefore similar to the duplex wire found at Defendant's residence). The opinions are also helpful in ascertaining the AWG sizes to which the fragments and wires correspond. And again, although the copper color of the conductor wire may be apparent, the fact that all the relevant items have a single strand conductor (as opposed to any other type) needs expert interpretation to be properly understood.

On this point, the Court again recognizes that, to be admissible, expert testimony need not establish every fact in issue, and such evidence need not be crucial to the proponent's case. Although described more fully in the legal standard section, essentially, it is enough that the expert testimony is both relevant and reliable.

---

[6] Although Defendant doesn't object on this basis, the information in Figure 16 appears not to be entirely accurate. In the "Comments" section of Figure 16, Item 519 is described as having a red stripe on it, and Item 514 is not, but the detailed descriptions and a photograph (*see* Figure 14) suggest that Item 514 has the red stripe, and Item 519 does not (*see* Figure 15). Moreover, it is unclear why Item 513 is not included in the Figure 16 chart. Item 513 is described as three lengths of wire with the relevant characteristics. (*See* Figure 13.)

### 3.     Methodology

Defendant's argument that there are no standardized procedures for making these types of comparisons fails to account for the flexible nature of the Court's inquiry into reliability as described in *Kuhmo Tire*. (*See* Mot. at 31.)   The Court rejects Defendant's methodology challenge.  The analysis in this instance is not informed by the application of standardized scientific testing.  Instead, the opinions are reliable based on the data obtained by a reliable method (visual inspection) by qualified experts who explain at length the exact characteristics that indicate the wire fragments are similar to the seized wires.

### 4.     Morefield's Experience Provides the Basis for the Opinion About the Limited Applications for the Yellow Wires

Defendant objects to expert evidence that the wires seized from Defendant's residence (and the fragments of similar wires recovered from the blast scene) are commonly used in pyrotechnics, but not in other applications.  (*See* Mot. at 33-34.) As for the first part, that the yellow-insulated wires are commonly used in pyrotechnics, Morefield's experience provides a basis for such testimony.  The testimony is both helpful and reliable.

At the hearing, the Government better articulated the basis for Morefield's opinion regarding the second part, that the yellow-insulated wires are not commonly used in other applications.  Government counsel represented that Morefield has had the occasion to search out such wire to be used in explosive devices he constructed, and he found them to be "uncommon" and "difficult to find" outside of pyrotechnic sources.  Assuming the Government lays a sufficient foundation at trial, such testimony is admissible.

Relatedly, Defendant criticizes the failure to take into account an "error rate." (Mot. at 32.)  Defendant's point is that, if it is unknown how common these types of wires are in the population, it is impossible to determine how reliable the expert's testimony on this point is.  However, Defendant attempts to impute too exacting a

standard.  In suggesting that these wires link Defendant to the IED that killed the decedent, the Government will attempt to establish that possession of such wires is relatively uncommon.  The Defendant is free to cross-examine the expert regarding the commonality of the wires, and he is free to develop his own evidence that such wires are, in fact, common, and/or that they have other applications.

### E.    Rule 403 Does Not Require Exclusion

Defendant makes a number of Rule 403 challenges.  (*See* Mot. at 29 (appearing to challenge the whole of Morefield's and Finnerty's Reports).)  He objects to the reports to the extent they are based on the experts' theories of how the IED could have been made.  (*See id.*)[7]  Defendant also objects to Morefield's discussion of use of the wires in detonators because (1) no detonator was found and (2) Morefield opined that the IED exploded at 11 Mareblu consisted of low explosives rather than high explosives, and low explosives do not use detonators.  (Mot. at 34.)

The Court separately discusses the issue of detonators below, but otherwise rules as follows:  As to the entirety of the Morefield and Finnerty Reports, as well as their disclosed areas of anticipated testimony, Defendant has raised no apparent Rule 403 issues.  The same is true as to the more specific issues related to the physical components of the IED.  This expert evidence is unquestionably relevant and much of it is highly probative.  In no instance does the danger of unfair prejudice substantially outweigh such probative value.

Moreover, should the expert evidence prove to be cumulative, this is a concern best managed at trial in real-time conditions.[8]  At present, the Court merely notes that both Morefield and Finnerty make unique contributions to the explosives expert

---

[7] In making this objection, Defendant does not cite any particular disclosure or expert report. However, in its October 1, 2021, disclosure letter, the Government disclosed Morefield's and Finnerty's anticipated testimony, including their opinions regarding how the IED at issue may have been made.  (*See* Mot. Ex. 1 at 1-4.)  For instance, as to Morefield, the Government disclosed that "[w]hile the exact switch . . . could not be identified, a simple switch could be fashioned using two wires that would cause the IED to explode when the box is opened by an individual."  (*Id.* at 3.)

[8] The Court understands that the Government wishes to preserve its flexibility and is concerned regarding the availability of witnesses in light of COVID-19 pandemic.  (*See* Opp. at 27 n.12.)

evidence currently of record, but that their opinion evidence also overlaps in certain areas.

As to evidence regarding detonators, Defendant's criticism appears to focus on any application of the findings of Morefield's article (wherein he created explosions using high explosives) to the present case, in which Morefield opines the explosion was caused by low explosives.  (*See* Mot. at 22; *cf.* Morefield Rpt. at 14.)  However, Morefield's article explains that his goal in setting up the experiment was to test the effect of blast overpressure on wires in IED fuzing systems to attempt to refine when investigators can conclude it is likely that a wire fragment found at the scene is a component of the explosive device.  It is not entirely clear whether the results vary significantly between explosive types, but the discussion in the article regarding the "[f]lat explosive charge" and "surface geometry and scaled distances" suggest at least some small differentiation among various types of explosives.  (*See* Morefield article at 26-27.)

As to this particular Rule 403 argument, the evidence at issue is not precisely identified or succinctly described.  Moreover, neither the argument in favor of its exclusion, nor the opposition to that argument, is particularly well-developed.  (*Compare* Mot. at 22 *with* Opp. at 19.)  The Government's argument does not appear to appreciate the precision of the term "detonate" as being limited to initiation devices used for high explosives, as explained by its own expert.[9]  (*See* Morefield Rpt. at 14.)

It is unclear whether the Government will offer testimony regarding detonators or detonation.  If it does, as the proponent of the evidence, the Government will bear the burden of establishing the relevancy of testimony.  Upon being apprised of that evidence, the Court will be able to ascertain not only its relevance but whether Rule 403 bars its admittance.

---

[9] An earlier Order by the Court also failed to appreciate this precision.  (Doc. 325, Dec. 23, 2021 Order Granting in Part and Denying in Part Motions to Exclude Expert Testimony at 7, 9-10 (using the term "detonate" in connection with the IED that exploded at 11 Mareblu).)

# III.  MOREFIELD AND PARROT'S OPINIONS RELATED TO BOMB CHEMISTRY

Defendant challenges three opinions:  First, explosives expert Morefield and chemist Raleigh Parrott will opine that the IED that exploded at 11 Mareblu was comprised of a certain amount and mixture of chemicals and that there were additionally other combinations that could have caused the damage at 11 Mareblu; second, Morefield will additionally opine that fuel is usually consumed by the blast, making the fuel difficult to identify; and third, Finnerty will opine that using certain amounts of chemicals seized from Defendant's residence, one could make a significant amount of low explosive.  (Mot. at 34-38.)  Rule 702 does not require exclusion of any of these opinions.

## A.    Opinions Regarding Chemical Mixtures

### 1.    Opinions Regarding the Types and Mixes of Chemicals Have a Sufficient Basis in Fact

Defendant argues that three opinions regarding the chemicals used in the IED lack sufficient facts and data.  (Mot. at 35-36.)  First, Morefield and chemist Parrot are expected to testify that the bomb could have contained three specific mixtures of chemicals.[10]  (*See* Mot. Ex. 16 at 2 (Gov. Nov. 21, 2021 Discl. Ltr.).)  Specifically, those combinations are  "approximately 9.9 pounds of a potassium chlorate/aluminum mixture, approximately 9.6 pounds of a potassium chlorate/sulfur mixture, and approximately 15.5 pounds of a potassium perchlorate/aluminum mixture."  (*Id.*)  Second, Defendant also objects to opinions that the bomb may have used aluminum-based fuel.  (Mot. at 35.)  Finally, Defendant seeks to exclude Finnerty's opinion,

---

[10] The Court previously ordered the Government to make further disclosures regarding other unspecified combinations of chemicals.  Since then, the Government has disclosed that there are "limitless combinations."  (*See* Reply at 1 & Ex. A at 4 (Gov. Jan. 3, 2022 Discl. Ltr.).)  Assuming there are limitless combinations, the Government cannot be faulted for failing to more specifically disclose them.  This point can be probed on cross-examination or, if an unsound conclusion in its own right, may be rebutted by a defense expert.  The Court rejects Defendant's argument that the Government's supplemental disclosure on this point is insufficient.

expressed in his report regarding the November 4, 2021 blast re-creation,[11] that the bomb may have included "aluminum German black flake and potassium perchlorate." (Mot. at 36 (citing Ex. 17 ("Finnerty Supp. Rpt.")).)

Defendant himself acknowledges that chemical testing of swabs from items at the scene of the blast and nearby soil samples reveal ions from chloride, chlorate, perchlorate, potassium, and sulfate.  As indicated by the Government's disclosure, Parrot "is expected to testify that the presence of chloride, chlorate, and perchlorate ions could indicate the use of a chlorate or perchlorate based oxidizer with an explosive composition."  (Mot. Ex. 1 at 5 (Gov. Oct. 1, 2021 Discl. Ltr.).) Defendant argues, however, that the experts are merely speculating that these ions are present because of the chemicals in the bomb and that their presence may be due to other factors.  To the extent there may be other explanations, Defendant is free to explore those explanations on cross-examination or present a rebuttal.  As it is, the presence of the particular types of ions constitutes a sufficient factual basis for the opinions that these ions correspond to particular types of chemicals that may have been used in the IED.

As to the opinions that the IED contained aluminum-based fuel or may have used "aluminum German black flake," although there is no mention of aluminum ions, the arson investigators made note of a metallic smell at the blast scene in the hour after the blast.  And Finnerty's re-creation of the blast successfully employed the use of aluminum German black flake and potassium perchlorate, resulting in damage not unlike the blast at 11 Mareblu.  (*See generally* Mot. Ex. 17 (Finnerty Supp.).)  Thus, opinions regarding the inclusion of aluminum as part of the IED have a sufficient basis in fact.

---

[11] The Court rejects Defendant's timeliness argument.  (*See* Mot. at 36, 38-39.)  In light of the continuance of trial, Defendant cannot now claim prejudice as a result of the disclosure of the Finnerty re-creation report after the deadline for expert disclosures.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 2.     Chemicals Could be Packaged in a 12" x 6" x 6" Box

Defendant also challenges as lacking a reliable methodology and/or based on unsound principles those expert opinions that specified amounts and mixtures of chemicals would fit in the 12" x 6" x 6" exemplar box.  (Mot. at 3, 17.)  At the outset, the Court notes that, pursuant to *Kuhmo Tire*, a generally accepted methodology is not required in this instance.  Nevertheless, Morefield's Report sets forth a specific methodology which Defendant does not address.  Specifically, Morefield's Report explains how he arrived at his conclusions, noting that he determined the usable cubic inches found within the exemplar box, the densities of various types of chemicals, and that he used calculations derived from a study conducted by the New Mexico Tech Energetic Materials Research and Testing Center, published in 2001.  (*See* Morefield Rpt. at 51-52.)  He thereafter applied this methodology to four different mixtures of chemicals that he states would have fit in the exemplar box, two of which he identified as requiring a detonator to reliably explode and as uncommon in the use of IEDs.  (*Id.*) The Court therefore rejects Defendant's Rule 702 argument.

### B.     Fuel is Consumed by the Blast

Defendant argues that Morefield's opinions regarding fuel being consumed by the blast lacks sufficient data.  (Mot. at 37-38.)   It is, as always, difficult to prove a negative.  Here, the Government's disclosure reveals that Morefield's opinion is that "the fuel is usually consumed" during an explosion; thus, it is an opinion that it is generally in the nature of an explosion to consume available fuel or, more specifically, that it is in the nature of an IED to consume the very fuel its creator builds into it to cause the intended explosion.  (*See* Mot. Ex. 1 at 3 (Gov. Oct. 1, 2022 Discl. Ltr.).) This is wholly unsurprising and within the experience of the expert who has the benefit of having observed and engineered multiple explosions.  Therefore, the Court rejects Defendant's Rule 702 argument.

### C.     Rule 403 Does Not Require Exclusion of Evidence of Chemicals Seized from Defendant's Residence

Defendant also argues broadly for exclusion of expert evidence relating to the chemicals seized from his residence as irrelevant and/or unduly prejudicial.  (Mot. at 36-37.)  He argues that testimony regarding how the IED could have been created with the type of chemicals seized at his residence is both irrelevant and unduly prejudicial.  (*Id.* at 36.)  On these same two grounds, he argues for exclusion of testimony regarding any particular chemical seized from his residence that does not have a corresponding chemical residue found at the blast scene.  (*Id.* at 36-37.)  He also points to evidence that certain chemical residues can be derived from innocuous cleaning products or other sources.  (*Id.* at 37 (citing to Mot. Ex. 21, FBI chemical analysis of items seized from a dumpster, referring to chlorate ions and sulfate ions).)

Combining these considerations, Defendant appears to argue that he would be unfairly prejudiced by the admission of evidence of chemicals of anything other than a chemical found at his residence that both was present in residue from at the blast scene and which does not have an innocuous purpose.  (*Id.* ("It does not help identify Defendant or anyone else by pointing out they have any number of chemicals that could make a bomb when there is nothing to suggest those chemicals were found or used in the 11 Mareblu explosion.").)  Defendant contends that unfair prejudice results where the Government is permitted to "speculate and scare the jury about all the various types of bombs [Defendant] *could* have made."  (*Id.* (emphasis in the original).)

This evidence is clearly relevant.  According to the Government's experts, chemicals and/or chemical precursors capable of constructing an IED such as the one that exploded at 11 Mareblu were found in Defendant's residence.  Where ions corresponding to a particular seized chemical were found at the blast scene, the probative value is at its highest ebb.  But where there is no corresponding chemical residue, although the probative value may be lessened, it does not disappear.  The

23

same is true where there is an innocuous explanation for the presence of the chemicals in Defendant's residence, or another potential source for the ions recovered from the blast scene.  The innocuous explanations are not the only explanations for the presence of the chemicals or their ions; they are simply another possible explanation.  Alternative possibilities do not eliminate the probative value of this evidence.

The Tenth Circuit held similarly in *United States v. Nichols*, 169 F.3d 1255, 1266 (1999), wherein it considered the relevance of an expert's opinion regarding "the composition of [a] bomb and its possible detonation device."  There, the expert opined that the damage to the federal building in Oklahoma City was "consistent with a bomb containing or including an ammonium-nitrate-based explosive . . . that could have been detonated with Primadet blasting caps."  *Id.* at 1262 (internal quotation marks omitted).  The court found the opinion relevant because it linked the defendant to the bombing in light of his purchase of ammonium-nitrate fertilizer and his possession of Primadet blasting caps.  *Id.* at 1266.  The court so found even though the expert "could not identify the exact explosive device" and instead opined, as the experts do here in various capacities, that the damage was "consistent with" such a described explosive device.  *Id.* at 1262.

Having found the evidence relevant, the Court considers Defendant's Rule 403 challenge.  The Court discerns no danger of unfair prejudice, and certainly not a danger of unfair prejudice that substantially outweighs the probative value of this evidence.  The expert evidence is relevant and has a basis in fact; therefore, Defendant's argument that it is "speculative" must be rejected.  (*See* Mot. at 35-37.)  Rather than an attempt to "scare the jury" with the unknown, it appears from the record that the experts opine  regarding what "could have" fueled the IED simply because an explosion destroys most (but not necessarily all) of the evidence of how the IED was fueled.  (*See* Mot. at 37.)  Moreover, the Tenth Circuit rejected a similar Rule 403 challenge to the expert testimony in *Nichols*, noting that the expert would not testify that the defendant created the bomb but would instead testify merely that

24

the bomb was consistent with certain materials. *Nichols*, 169 F.3d at 1266.  Evidence linking the defendant to those materials came from other sources.  *Id.*  The same is true here:  The experts are not expected to testify that Defendant created the IED; rather, they are expected to testify only that the IED could have been constructed using certain materials and chemicals.  Evidence linking Defendant to those materials is expected to come from other sources.

This evidence is relevant and is not excludable under Rule 403.

## IV.   BOMB TECHS AND ARSON INVESTIGATORS' OPINIONS

At the outset, the Court notes that much of these investigators' anticipated testimony is percipient testimony, informed by their expertise, rather than expert testimony.  Defendant objects to three expert opinions:  (A) that there was a distinctive metallic smell in the immediate aftermath of the explosion; (B) that the explosion caused white smoke; and (C) that the blast was caused by an IED.  (*See* Mot. at 39-41.)

### A.   Distinctive Metallic Smell

Defendant's argument regarding the metallic smell is confined to the Government's purported failure to disclose the bases and reasons therefor.  (Mot. at 40.)  The Court has already ruled on this issue, stating:  "that there was a distinctive metallic smell at the blast scene . . . is percipient testimony that is informed by the expert's education, experience, and/or training."  (Doc. 325, Dec. 23, 2021 Order Granting in Part and Denying in Part Motions to Exclude Expert Testimony at 13 ("Dec. 23, 2021 Order").)

In the Reply, Defendant argues that the opinion that the metallic smell was caused by a metal fuel, such as aluminum, was not timely disclosed.  (*See* Reply at 9.)  However, as early as October 29, 2021, the Government disclosed that the fuel for the IED may have included aluminum.  (*See* Mot. Ex. 4 (disclosing Morefield's opinion that the IED could have contained "9.9 pounds of a potassium/aluminum mixture").)  Combining this October 29, 2021 disclosure with the earlier September 30, 2021,

25

disclosure regarding the "distinctive metallic smell"), it is predictable that an expert may testify that the metallic smell could be attributed to the presence of aluminum. (Mot. Ex. 2 at 2.)

### B.   White Smoke

Defendant objects to expert evidence of the presence of white smoke at the blast scene.  Defendant contends such evidence is irrelevant, lacks a sufficient factual basis, and is unreliable because of a lack of cited studies.  (Mot. at 40.)

The presence of white smoke after the blast is clearly relevant.  It is a characteristic of the explosion itself:  the explosion caused white smoke.

The observations that there was white smoke is the result of the investigators' sensory perceptions, making it percipient testimony rather than expert testimony. However, what the white smoke signifies is a subject for expert testimony.  Therefore, the observations of the investigators of the presence of white smoke provides the factual basis for the expert opinions that discuss what that white smoke may signify.

To the extent Defendant's objection is on a *Daubert* factor such as lack of cited studies, this is another example of an instance in which rigid application of the *Daubert* factors is inappropriate.  Experts who have exploded chlorate- or perchlorate-based explosive devices may testify regarding the characteristics of the smoke such explosions cause based on that experience.  Moreover, with the re-creation blast, Finnerty used "Potassium Perchlorate," which resulted in an explosion producing white smoke.  (*See* Finnerty Supp. at 3, 17 (Fig. 17).)

### C.   Cause of Blast

Defendant argues that this opinion has an unreliable basis, noting that the conclusion was based "in part" on the discovery of the 9-volt battery remnants and on the wire fragments.  (Mot. at 41.)  The Government correctly points out that this opinion is based upon a multitude of factors beyond the mere presence of what appeared to be a battery.  (*See* Opp. at 26.)  Moreover, the Court's December 23, 2021 Order noted multiple bases for the conclusion regarding the cause of the blast:

Numerous bases for this conclusion are disclosed, including the ruling
out of the presence of natural gas or oxygen as fuel for a vapor explosion.
(*See, e.g.*, Supp. Rpt. 1 at 3-4; Supp. Rpt. 2 at 4 (pre-blast witness noticed
no unusual smells); Supp. Rpt. 5 at 5-6 (ruling out oxygen as an
explosive).)  The bases for the conclusion that the cause was instead an
IED are set forth as well.  (*See generally* Supp. Rpt. 5 (discussing likely
cause of explosion);  *see* Supp. Rpt. 2 at 5 (noting that the "damage was
consistent with a significant overpressure event originating inside of the
room"); Supp. Rpt. 3 at 3 (noting witness stated that the victim appeared
to be opening box when explosion occurred); Supp. Rpt. 2 at 6 (debris
and body part dispersion).)

Dec. 23, 2021 Order at 13.

On this record, the expert evidence regarding the significance of the distinctive
metallic smell, the significance of the white smoke, and the cause of the blast is
relevant, is based on a sufficient factual foundation, and is reliable; therefore, it is
admissible under Rule 702.

## V.    BRUNO'S "QUESTIONED DOCUMENTS" OPINIONS

Bruno is an expert in the FBI laboratory category of "questioned documents."
She will testify about four items:  a Sim card from a cellular phone, a letter, a piece of
tape, and cardboard markings.  (*See* Mot. at 2-3.)  Her relevant conclusions as to each
are discussed below.

Defendant challenges in a general manner "the scientific reliability" of any
"questioned documents" analysis.  (Mot. at 15-16.)  However, as discussed at length
above in connection with explosives experts Morefield and Finnerty, the examinations
undertaken by and comparisons made by Bruno do not implicate any particular
scientific discipline.  Bruno's opinions are much more akin to those governed by
*Kuhmo Tire.*

### A.   Sim Card

On the Sim card, Bruno found numbers by examining it using an "alternate light source on the VSC 8000." (*See* Mot. Ex. 3 at 2 ("May 19, 2018 Bruno Rpt").) Defendant's only specific challenge to this opinion is the Government's "fail[ure] to offer any explanation of Bruno's use of Video Spectral Comparator (VSC)." (Mot. at 16 n.5.)  At least as to the Sim card, that this method is reliable is self-evident:  The photograph provided in Bruno's Report shows the numbers that she identifies as being visible as a result of the method employed.  (May 19, 2018 Bruno Rpt at 2.)

### B.   Letter

The letter, in Bruno's opinion, yielded a handwriting sample "suitable for future handwriting comparisons." (*Id.* at 1-2.)  Defendant questions the reliability of handwriting analysis generally, relying on out-of-Circuit cases, but the Ninth Circuit has recognized the admissibility of handwriting analysis. *See United States v. Prime*, 431 F.3d 1147, 1152-53 (9th Cir. 2005).  And here, the expert merely opines that the letter provides a handwriting sample, it does not make any particular comparisons.

Defendant challenges the helpfulness of this opinion.  (Mot. at 17.)  This opinion is of minimal probative value, which may be limited to showing that the Government conducted a thorough investigation.  Although the Court denies the Motion to Exclude on this point at this time, relevancy is best determined in the real-time conditions of trial, and the Court may exclude this evidence at that time.

### C.   Tape

Bruno examined a piece of tape and concluded that its torn edges would be suitable for comparison with another roll of tape to determine if that roll was its source. (*See* Mot. Ex. 4 at 1 ("July 2, 2018 Bruno Rpt.").)  Again, without a roll of tape suspected of being the source of the piece of tape, the expert's opinion that this is suitable comparison piece lacks much probative value.  Therefore, although the Court denies the Motion to Exclude on this point at this time, relevancy is best determined in the real-time conditions of trial, and the Court may exclude this evidence at that time.

### D.   Cardboard

The cardboard was compared to the 12" x 6" x 6" exemplar box.  (*See* Mot. Ex. 5 at 1 ("Dec. 4, 2018 Bruno Rpt.")  Bruno was unable to reach a conclusion as to whether the cardboard was produced by the same manufacturing source as the exemplar box.  (*Id.*)  Specifically, she stated:  "No conclusion could be reached whether or not [the cardboard piece] was produced by the same manufacturing source as [the exemplar box] due to a lack of individual characteristics."  (*Id.*)  She also observed that certain "inked markings" on the cardboard piece were "not consistent with any markings on [the exemplar box,]" but also noted she could not rule out the possibility that the inked markings on the cardboard piece were placed there "after the manufacturing process."  (*Id.*)

Defendant challenges Bruno's classification of this comparison based on the three categories of possible conclusions described in Bruno's Report.  (Mot. at 16-17; Dec. 4, 2018 Bruno Report at 2.)  These three categories represent the spectrum of conclusions regarding a comparison of two items and, simplified, the categories may be said to range from "corresponding in manufacturing characteristics" to "lack of corresponding in manufacturing characteristics," with a "no conclusion" category in the middle of the two.  From Bruno's description, set forth above, she chooses the "no conclusion" category based on the "lack of individual characteristics."  Her description indeed seems to correspond with the middle category, which is fully described as:  "No Conclusion/No Determination - When there are limiting factors, a report that no conclusion could be reached is appropriate.  It may be possible to report that the items correspond in general class characteristics.  This opinion requires an explanation of the limiting factor(s)."  (*Id.*)

Defendant contends that the "Do Not Correspond" category is more appropriate.  (Mot. at 16-17.)  The "Do Not Correspond" category applies where "[t]he items do not correspond with to one another due to disagreement in general class characteristics and/or manufacturing characteristics" and "[a]ny limited

similarities are far outweighed by the combined effect of sufficient disagreement in all other details."  (Dec. 4, 2018 Bruno Rpt. at 2.)

Rule 702(d) requires that "the expert has reliably applied the principles and methods to the facts of the case."   Fed. R. Evid. 702.  In arguing that Bruno should have concluded that the "Do Not Correspond" category applied, Defendant challenges Bruno's application of her system of categorization.  In Defendant's analysis, the latter category applies because the "inked markings" on the cardboard piece does not correspond  with the exemplar, and this dissimilarity, coupled with the more general "lack of individual characteristics" means that there is "disagreement in general class characteristics and/or manufacturing characteristics" which "far outweighs" the items' "limited similarities."  (*See* Mot. at 16-17.)

Defendant's argument does not advance an unprincipled application of the system of categorization in Bruno's Report, but neither is Bruno's contrary conclusion unprincipled or unreasonable.  In this way, Defendant's argument identifies a weakness in the expert's application of the three stated categories, but this weakness does not render the expert's opinion unreliable.  Rule 702's reliability inquiries do not require that the Court exclude expert opinions where the expert came to the wrong conclusion.  *See Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) ("[I]ssues regarding the correctness of [an expert's] opinion, as opposed to its relevancy and reliability, are a matter of weight, not admissibility.").  Thus, Defendant may attack this weakness in Bruno's Report through cross-examination or through its own expert testimony, but the Court does not exclude the opinion based on this argument.

Defendant also argues that Bruno's "inconclusive" conclusions are not helpful.  (Mot. at 17.)  The Government responds that even inconclusive conclusions are relevant because they counter the notion that the FBI conducted a defective investigation.  (*See* Opp. at 31.)  As to this and other such evidence, the Government argues that inconclusive findings are offered to show the thoroughness of the whole of

30

the investigation, and to draw the "sting" from any argument by Defendant that the investigation was defective.  The Ninth Circuit has recognized this practice as both acceptable and expected.  *See United States v. Barragan*, 871 F.3d 689, 703 (9th Cir. 2017) ("[T]he prosecution was entitled to draw the sting from this anticipated attack."); *United States v. Feldman*, 788 F.2d 544, 555 (9th Cir. 1986) ("Similarly, drawing the 'sting' from the opposing party's anticipated arguments through the presentation of one's own case is a standard and proper litigation technique.").

### E.    Rule 403 Does Not Require Exclusion

Defendant argues that the inconclusive findings should be excluded under Rule 403.  (Mot. at 17.)  To be sure, the probative value of an "inconclusive" determination is low.  The probative value is found in establishing that the Government conducted a thorough investigation.  And presenting such evidence does not risk unfair prejudice to Defendant.  The evidence on its face is inconclusive and there is no reason to believe a jury would not consider such findings at face value.  To be excludable under Rule 403, the danger of unfair prejudice must substantially outweigh the probative value of the evidence.  That standard is not met here.

## VI.    MARVIN'S METALLURY OPINIONS

### A.    Metal Strip

Defendant challenges Marvin's opinion that a particular metal strip found at the blast scene is suitable for comparison to a specific product source, if a comparison metal strip or source could be located.  (Mot. Ex. 8 ("June 26, 2018 Marvin Rpt.").)  This is like the handwriting sample and the torn piece of tape; without a comparator, it is of minimal probative value. Therefore, although the Court denies the Motion to Exclude on this point at this time, relevancy is best determined in the real-time conditions of trial, and the Court may exclude this evidence at that time.

### B.    Similarity of Wires

Defendant also raises two challenges to Marvin's opinions that involve examination of yellow-insulated wire fragments from the scene and comparison of

those fragments to wires and cords seized from Defendant's residence. (*See generally* Mot. Exs. 9-12.)  First, Defendant challenges Marvin's qualifications; second, he challenges an opinion that wire fragments are of the same type of wire as a length of undamaged wire seized from Defendant's residence. (*See* Mot. at 18-19; Ex. 12 at 3 ("June 12, 2020 Marvin Rpt.") (opinion phrased as "inclusion as to product type").)

### 1.  Qualifications

At the outset, the Court rejects Defendant's challenge to Marvin's qualifications to analyze the wire fragments to the extent they consist of both metal ***and*** plastic.  . Therefore, Defendant argues that because Marvin's specialty is metallurgy, not polymers, her opinions should be limited to opinions about metal.  (Mot. at 18.)  The Government responds with a definition of metallurgy as "the art and science of . . . studying the[] properties and behavior [of metals] as affected by the composition, treatment in manufacture, and conditions of use." (Opp. at 32.)  Thus, the Government argues that Marvin can testify as to the insulated wire as related to the treatment of metal in manufacture.  (*Id.*)  The Government contends that Marvin should be permitted to opine on the insulated wires because she "analyzes metals, not in their abstract state, but in the products with metal components submitted for analysis in order to answer questions in an investigation."  (*Id.*)  Based on Marvin's expertise as a metallurgist, she is qualified to testify regarding the insulated wire which includes a metal conductor as a component of the insulated wire.

### 2.  Inclusion as to Product Type

Defendant objects to Marvin's opinion that the wires found in Beal's residence are similar to the wire fragments found at the blast scene, arguing that the opinion is unhelpful and that it should be excluded under Rule 403.  (Mot. at 18-19.)  Defendant objects on "helpfulness" grounds and Rule 403 grounds as to an opinion that the product types are similar.  (*See* Mot. at 18-19; June 12, 2020 Marvin Rpt.)

Specifically, Marvin opines that certain wire fragments recovered from the blast scene (identified as Items 189-2, 189-3, 201, 310, 326, and 313) and items seized from

32

Defendant's residence (identified as Items 499, 500, 501, 503, 513, and 519) are the same product type, or that there is "inclusion as to product type." (*Id.* at 1-3.) She bases this opinion "on similarities in conductor size and composition, and insulation color and configuration," noting that the wire fragments "could potentially have been produced from the same type of wire product" as four of the items seized (Items 501, 503, 513, and 519). (*Id.*) Marvin also noted that the fragments "could potentially have been produced from the same type of wire product as . . . the yellow-insulated, two-conductor cord in Item 499, or from the yellow-insulated side of the same type of wire product in Item 500." (*Id.*) She goes on to acknowledge that the undamaged conductors were somewhat larger in diameter but that such differences could be attributed to deformation of the wire fragments from the blast, or a manufacturing variation, or a combination of both. (*Id.*) Alternatively, she acknowledges that this difference could be the result of "different manufactured sources of generically similar wire product type." (*Id.*)

Express limitations are noted regarding this conclusion, including the acknowledgement that the wires are mass produced, are widely available, and that "it can reasonably be expected that a large amount of wire that was manufactured to a similar product specification would appear similarly made." (*Id.* at 4.) The limitations specifically state: "'*Inclusion as to product type*' does not imply that the manufacturing source of any of the wire products [seized from Defendant's residence] is the same as the manufacturing source of the product(s) from which the wire fragments [recovered from the blast scene] originated." (*Id.*)

Defendant's "helpfulness" challenge fails because the opinion evidence is relevant. The expert testimony is that the wire fragments and the seized wires are the same product type, which, if believed, makes it more likely that the wire fragments could have come from the wires seized from Defendant's residence, which is undeniably probative of whether Defendant constructed the IED.

Defendant's Rule 403 argument regarding the danger of unfair prejudice is unpersuasive. The probative value of the evidence is high, even when discounted for the fact that the expert cannot say that the fragments and the wires came from the same manufacturing source. Moreover, even as undercut by the express acknowledgement that some of the conductors within the seized wires have larger diameters than the conductors found in the wire fragments, the probative value is still not low. And there is no danger of unfair prejudice in the jury being presented with the evidence, together with the clarifications and limitations, which may be probed on cross-examination. The danger of any unfair prejudice must substantially outweigh the probative value, and the balancing test here tips sharply in favor of admission.

## VII.   GARFINKLE'S DNA OPINIONS

Defendant challenges the DNA expert's opinions in three ways. First, Defendant contends that her opinion that environmental factors affect DNA quality lacks scientific support; second, Defendant contends that she misapplied her own lab protocols to three specific items she examined; and third, Defendant challenges her inconclusive findings as not relevant and/or excludable under Rule 403. (Mot. at 19-21.)

### A.   Environmental Factors on DNA Quality

Notwithstanding Defendant's objection, Garfinkle may testify that the quality of DNA samples may be affected environmental factors. (*See* Mot. at 19.) Under *Kuhmo Tire*, Garfinkle's experience, which includes a degree in microbiology and approximately seventeen years in the field of forensic biology and DNA analysis, both qualifies her to testify regarding DNA degradation due to environmental factors and provides a sufficient factual basis therefor. Such evidence has been admitted in other cases. *See, e.g., United States v. Perez*, No. 3:18-CR-274-VLB-1, 2021 WL 5999261, at *4 (D. Conn. Dec. 20, 2021) ("Mr. Bryant also testified about the impact environment has on DNA profiles. He testified that DNA can linger on an object for quite some time, even up to years, depending on environmental factors. . . . The best

34

conditions for longer lasting DNA are an indoor dry, cool environment."); *Andersen v. City of Chicago*, 454 F. Supp. 3d 801, 805-06 (N.D. Ill. 2020) (permitting expert to testify regarding DNA contamination and degradation and noting that the defendants' arguments regarding potentially degraded and contaminated DNA go to weight not admissibility).

### B.     Application of Lab Protocols

Defendant next argues that Garfinkle failed to correctly apply her own protocols to her testing as to three items:  Items 118, 160, and 175-1.

Item 118 appears to be a swab of a wire fragment recovered from the blast scene.  (*See* Mot. Ex. 16 at 1 ("Aug. 7, 2018 Garfinkle Rpt.") (describing this item as "swabbing of wire and textured areas of plastic portion of electrical component").) Garfinkle's testing identified Defendant's and the decedent's DNA as "inconclusive" for this item.  (*See id.* at 1 & 2 n.2.)  According to Defendant's expert, there is insufficient genetic material to offer any opinion regarding this item.  (*See* Mot. at 19-20 (citing opinion of defense DNA expert Mehul Anjaria).)  However, the Defendant's disclosure on this issue sets forth no basis.  (*See* Doc. 466 at 130, Mot. Ex. 23 ("Def. Dec. 31, 2021 Discl. Ltr.") (stating only that "[r]esults from Item 118 in this case do not have sufficient genetic information to have been interpreted and reported, and the qualitative statements provided in the DNA report are misleading").) The opinion regarding Item 118 as set forth in Garfinkle's Report meets the criteria for admission and thus, meets the Government's burden for establishing its admissibility.  The unadorned statement regarding the defense expert's opinion that there was insufficient genetic material does not persuade the Court otherwise.

Garfinkle's test results reveals that it is likely that the decedent's DNA was found on Item 175-1, wire with heat shrink.  (*See* Mot. Ex. 17 at 1 ("Oct. 2, 2018 Garfinkle Rpt.") (noting "[v]ery strong support for **Inclusion**") (emphasis in the original).)  Quoting his expert disclosure letter, Defendant argues in favor of exclusion by stating that Garfinkle "failed to follow her own protocol in that she failed to set up

35

the proposition conditioned on the presence of DNA that was reasonably expected to be present." (Mot. at 20 (quoting Def. Dec. 31, 2021 Discl Ltr.).)  The expert disclosure indeed states that, but does not explain the protocol itself.  Nor does Defendant cite to an explanation of the specific protocol Garfinkle was expected to employ.  Lacking context, this portion of Defendant's disclosure fails to establish that Garfinkle failed to follow a specific protocol.  Thus, like the opinion regarding Item 118, Garfinkle's opinion as to 175-1, as set forth in her Report, meets the criteria for admission and thus, meets the Government's burden for establishing its admissibility. And as was the case with Item 118, the Court discerns no basis from the defense expert's opinion to exclude Garfinkle's opinions as Item 175-1.

As to the third item, Garfinkle identifies Beal's DNA as inconclusive for Item 160, swabbing of a backpack.  (*See* Mot. at 20 & Ex. 15 at 2-3 & n.7 ("May 21, 2018 Garfinkle Rpt.").)  Regarding a contrary opinion as to this item, the defense disclosure letter states, without more, that "[r]esults from Item 160 in this case, previously deemed inconclusive," would now be "deemed exclusionary" under "the new [FBI] protocol." (Def. Dec. 31, 2021 Discl. Ltr. at 2.)  The disclosure letter states that "[i]n September 2018, the FBI issued a new protocol for Reporting STRMix Results and Conclusions," including the protocol "for making qualitative statements about comparisons of a person of interest to evidentiary samples."  (*Id.*)

The Government acknowledges this protocol change, additionally noting that it applies not only to Item 160 but also to Item 118:  Garfinkle's "'inconclusive' opinions relating to Items 118 and 160," would, under the new terminology, "be 'uninformative' (Item 118) and have 'limited support for exclusion' (Item 160)." (Opp. at 35.)  This change in terminology, and the failure to revise the reports after the change in terminology was adopted, are topics for cross-examination, but they are not a basis for exclusion.

**C.      The Evidence is Relevant and Rule 403 Does Not Require Exclusion**

Like the inconclusive opinions discussed previously in connection with the cardboard, the probative value of an "inconclusive" determination as to DNA evidence is low.  The probative value would be at its highest to show that the Government conducted a thorough investigation.  However, notwithstanding the low probative value, there is no discernable risk of unfair prejudice.  The evidence on its face is inconclusive and there is no reason to believe a jury would not consider that finding at face value.  To be excludable under Rule 403, the danger of unfair prejudice must substantially outweigh the probative value of the evidence.  That standard is not met here.

## VIII.  CARPENTER'S FINGERPRINT OPINIONS

Finally, Defendant challenges Carpenter's opinion regarding the impact of environmental factors on fingerprint collection, arguing that Carpenter does not offer any source or support for his conclusions.  (Mot. at 21 & Exs. 19-21.)  Under *Kuhmo Tire*, Carpenter's experience, which includes a master's degree in forensic science and over twenty years of fingerprint analysis for the FBI, both qualifies him to testify regarding environmental factors on fingerprint evidence and provides a sufficient factual basis therefor.  (*See* Mot. Ex. 18 (Carpenter CV).)

Moreover, the Ninth Circuit has affirmed admission of such evidence a number of times.  *See, e.g., United States v. Burdeau*, 168 F.3d 352, 356-57 (9th Cir. 1999) (stating that negative fingerprint testimony was admissible as "[t]he testimony aided the jury in understanding why [defendant's] fingerprints might not be found on items that the jury knew [defendant] had touched, which explanation could not otherwise have been readily apparent"); *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987) (affirming admittance of testimony of "skilled witness," an FBI agent, that fingerprints are obtained in only ten percent of bank robbery cases); *United States v. Feldman*, 788 F.2d 544, 554-55 (9th Cir. 1986) (similar).

Therefore, Carpenter's opinions regarding how environmental factors affect fingerprint evidence is not excludable under Rule 702.

## IX.   CONCLUSION

As set forth herein, the Court DENIES the Motions to Exclude Expert Testimony in their entirety.  The Court VACATES the evidentiary hearings on these matters, tentatively set for March 28, 2022, and May 9, 2022.

The Court ORDERS the Government to file a redacted version of this Order on the public docket, and to do so within ten days of the entry of this Order.

**IT IS SO ORDERED.**

**DATED:**  March 25, 2022

The Hon. Josephine L. Staton
United States District Judge